Richard James CARRILLO, Appellant,

v.

Joan FABIAN, Commissioner of
Corrections, Respondent.

No. A03–1663.

Supreme Court of Minnesota.

July 28, 2005.

Mike Hatch, Minnesota State Attorney General, Elizabeth Richter Schaffer, Jennifer A. Service, Assistant Attorneys General, St. Paul, MN, for Respondent.

Mikael Merissa, Teresa Nelson, ACLU of Minnesota, St. Paul, MN, for Amicus Curiae ACLU of Minnesota.

## OPINION

ANDERSON, PAUL H., Justice.

Appellant Richard Carrillo seeks review of a Minnesota Court of Appeals decision affirming the Washington County District Court's denial of his petition for writ of habeas corpus. Carrillo argues that the Commissioner of Corrections violated his constitutional rights by failing to provide him with sufficient procedural due process before extending his period of imprisonment by seven days. The commissioner extended Carrillo's incarceration time after a Department of Corrections (DOC) hearing officer found that Carrillo committed the disciplinary offense of disorderly conduct. In finding that Carrillo had engaged in disorderly conduct, the hearing officer used the following standard of proof specified by the DOC's policy: "some evidence in the record to support the charged violation of the offender disciplinary regulations." We reverse.

On November 23, 1999, a jury convicted appellant Richard Carrillo of the offense of drive-by shooting for the benefit of a gang. The district court convicted him of this offense and imposed an executed sentence of 114 months. At sentencing, Carrillo was informed that he would serve two-thirds of his time in prison and one-third on supervised release unless he committed a disciplinary offense. *See* Minn.Stat. § 244.101, subds. 1–2 (2004). Carrillo is incarcerated at the Minnesota Correctional Facility at Faribault (MCFF).

On May 24, 2002, a fight broke out at MCFF while Carrillo was on the prison baseball field with several other inmates. As a result of the fight, the prison guards called the inmates back inside the prison living quarters. As Carrillo walked toward the living quarters with a group of about ten other inmates, one of the inmates in his group, Robert Mendez, fell to the ground.

Lieutenant Susan Williams was in charge of administering the prison that day in the warden's absence. Williams

saw Mendez fall and filed an incident report in which she stated that Carrillo had shoved Mendez to the ground. Carrillo was given a Notice of Violation that stated that he was charged with violating Offender Discipline Regulations 320 and 412—disorderly conduct and assault of an inmate. A disciplinary hearing was held on June 5, 2002, before a DOC hearing officer. Carrillo was not represented by counsel at that hearing, although he did have a right to have a "representative" assist him in the preparation and presentation of his case.

At the hearing, Williams was the only witness to testify for the commissioner. She stated that she saw a white inmate put his hands on another inmate's shoulders and push him to the ground. She said she "couldn't identify [the inmate] that had gotten pushed," but that there was "no doubt in [her] mind" that Carrillo pushed the inmate. She testified that she identified Carrillo by his clothing and by "watch[ing] where he was walking." The record reflects that at the time of the incident, Carrillo wore a white t-shirt, gray sweatpants, and tennis shoes—the same outfit worn by all of the other inmates who were playing baseball.

Williams said she could not identify Carrillo's face because she was about 50 yards away from the inmates when the pushing incident occurred, but she maintained constant visual contact with Carrillo from the time she saw the incident until he reached the door to the living quarters. After witnessing the incident, Williams radioed the guards at the living quarters building and told them that a white inmate wearing a white t-shirt and gray sweatpants was approaching the building. Williams instructed the guards that when "the next white person comes in * * *, grab his ID." Based on Williams' information, the guards detained Carrillo.

Carrillo, Mendez, and a third inmate, Andrew McNalley, testified for Carrillo. Carrillo testified that he did not push anyone to the ground. Mendez testified that he stumbled and fell on his own while jogging toward the building and that no one shoved him. McNalley testified that he was present during the incident and that Mendez fell on his own and was not pushed.

In determining whether Carrillo had committed the disciplinary violations charged, the hearing officer relied on the standard of proof established by the DOC for major violations, which requires only that there be "some evidence in the record to support the charged violation of the offender disciplinary regulations." Minn. Dept. of Corr. Policy 303.010, H.[1] The hearing officer determined that Williams had clearly identified Carrillo as the person who pushed Mendez to the ground and that Mendez and McNalley were not credible. The hearing officer then found that Carrillo committed the offense of disorderly conduct and imposed a punishment of 45 days in segregation.

---

1. The Department of Corrections policy in effect at the time of Carrillo's disciplinary hearing did not differentiate between major and minor disciplinary violations, and both were subject to the standard of proof of "some evidence in the record to support the charged violation of the offender disciplinary regulations." Minn. Dept. Corr. Policy 303.010, H. (2001). We note for purposes of comparison that as of February 1, 2005, the Department of Corrections differentiated between major and minor violations. Minn. Dept. Corr. Policy 303.010, F.; G. (2005). This differentiation has resulted in a dual standard: the some evidence standard of proof for major violations remains in place, but the standard of proof for minor violations was raised to "more likely than not that the offender violated the disciplinary regulation." Id. at F.6; G.3.

Carrillo appealed the hearing officer's decision to the warden, and the warden affirmed. As a direct result of the decision, Carrillo served 23 days in segregation, and the commissioner delayed Carrillo's supervised release date by seven days, from April 4 to April 11, 2006.

Carrillo brought a petition for a writ of habeas corpus in Washington County District Court, arguing that the commissioner violated his constitutional rights by extending his term of imprisonment without providing sufficient procedural due process. The district court denied Carrillo's petition on August 26, 2003. The court of appeals affirmed the district court, concluding that Carrillo had not shown a protected liberty interest in his release date, and that even if he had, he received all process due. *Carrillo v. Fabian*, 2004 WL 1049206 (Minn.App. May 11, 2004) (unpublished opinion). We granted Carrillo's petition for review.

### I. .

■ Whether due process is required in a particular case is a question of law, which we review de novo. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Alcozer v. N. Country Food Bank*, 635 N.W.2d 695, 701 (Minn.2001). While a prison inmate does not enjoy the full range of rights and privileges available to ordinary citizens, he does not surrender all of his constitutional rights upon incarceration. *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The United States Supreme Court has stated, "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Id.* at 555–56, 94 S.Ct. 2963. Inmates are entitled to some degree of protection under the Due Process Clause; thus, prison authorities must provide inmates with an appropriate level of due process before

they are deprived of a protected liberty interest. *Id.* at 556, 94 S.Ct. 2963.

■ When engaging in a due process analysis, a court must conduct two inquiries. First, the court must determine whether the complainant has a liberty or property interest with which the state has interfered. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Second, if the court finds a deprivation of such an interest, it must determine whether the procedures attendant upon that deprivation were constitutionally sufficient. *Id.*

■ We first must determine whether Carrillo has a liberty interest in his supervised release date. The Due Process Clause of the U.S. Constitution provides that a state shall not "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has ruled that courts must look to the nature of an interest to determine if it is within the scope of the Fourteenth Amendment's protection of liberty and property. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Though the range of liberty interests protected by procedural due process is broad, it is not infinite. *Roth*, 408 U.S. at 570, 92 S.Ct. 2701. A constitutionally-protected liberty interest arises from a legitimate claim of entitlement rather than simply an abstract need or desire or a unilateral expectation. *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). Therefore, Carrillo must have a legitimate claim of entitlement to being released from prison on his supervised release date before his interest in being released on that date can qualify as a liberty interest.

The Supreme Court has held that state law can create liberty interests that are protected by due process. *Wolff*, 418 U.S. at 557, 94 S.Ct. 2963; *Sandin*, 515 U.S. at 483–84, 115 S.Ct. 2293. In *Wolff*, the Court held that while the Due Process Clause itself does not create a liberty interest in credit for good behavior, the statutory provision adopted by the state of Nebraska created a liberty interest in a shortened prison sentence that resulted from good time credits. 418 U.S. at 557, 94 S.Ct. 2963; *see* Neb.Rev.Stat. § 83–185 (1971). In Nebraska, good time credits were revocable only if the prisoner was found guilty of serious misconduct. Neb. Rev.Stat. § 83–185. In another case, the Court held that "the expectancy of release" provided in Nebraska's sentencing scheme was entitled to some measure of constitutional protection. *Greenholtz*, 442 U.S. at 12, 99 S.Ct. 2100. The Court concluded that some measure of protection was due to inmates whose parole requests were denied under a discretionary parole statute that provided that an inmate "shall" be released when his minimum term of imprisonment less good time credits expired. *Id.* at 11–12, 99 S.Ct. 2100.

Both parties and amicus curiae American Civil Liberties Union of Minnesota argue that we should look to the language of Minn.Stat. §§ 244.101 and 244.05 (2004), establishing Minnesota's determinate sentencing scheme, to determine whether the state has created a liberty interest in an inmate's date of supervised release. Carrillo and amicus argue, based on *Greenholtz*, that the use of mandatory language in Minnesota's statute establishes that Carrillo has a liberty interest in his supervised release date. Citing to *Greenholtz*, Carrillo argues that Minnesota's determinate sentencing scheme has triggered a similar expectancy of release from prison in inmates subject to that scheme. He asserts that the statute creates such an expectancy by requiring a sentencing court to explain the total length of a defendant's sentence, the amount of time the defendant will serve in prison, and the amount of time the defendant will serve on supervised release absent disciplinary offenses resulting in punishment while in prison. *See* Minn.Stat. § 244.101, subd. 2. Carrillo argues that the statute requires that a defendant be released from prison after serving two-thirds of his sentence, thereby establishing a liberty interest that is entitled to some measure of constitutional protection.

By contrast, the commissioner argues that Carrillo had no reasonable expectation that he would be released from prison on a specific date because the language of section 244.101, subd. 3 (2004), expressly provides that an inmate has no right to a specific, minimum length of a supervised release term. Additionally, the commissioner reasons that Carrillo's argument lacks merit because Minn.Stat. § 244.101, subd. 2, requires that the sentencing court explain to the defendant at the time of sentencing that "the amount of time the defendant actually serves in prison may be extended by the commissioner if the defendant commits any disciplinary offense in prison" and that such an extension "could result in the defendant's serving the entire executed sentence in prison." In the alternative, the commissioner contends that, if the *Greenholtz* mandatory language analysis remains intact, the statutes should be characterized as permissive because the length of an inmate's supervised release term is "subject to" the commissioner's authority to impose "any disciplinary confinement period" extending the term of imprisonment when the inmate has violated "any disciplinary rule adopted by the commissioner." Minn.Stat. §§ 244.101, subd. 1; 244.05, subd. 1b (2004).

Both parties focus too narrowly on the language of sections 244.101 and 244.05 to establish or defeat an inmate's expectation of supervised release and the existence of a protectable liberty interest. Since its decisions in *Wolff* and *Greenholtz,* the Supreme Court has expressed its disapproval of the emphasis that courts have placed on the mandatory or discretionary nature of statutes in seeking to determine whether the state has created liberty interest. *Sandin,* 515 U.S. at 479–84, 115 S.Ct. 2293.

In *Sandin,* an inmate brought a civil rights action against prison officials in the state of Hawai'i, challenging the imposition of disciplinary segregation for misconduct. *Id.* at 476, 115 S.Ct. 2293. The Ninth Circuit Court of Appeals drew a "negative inference" from the mandatory language of the prison regulation at issue and then, based on that language, concluded that the inmate had a liberty interest in not being subjected to disciplinary segregation. *Id.* at 476–77, 115 S.Ct. 2293; *see* Haw. Admin. Rule § 17–201–18(b)(2) (1983). The Supreme Court expressed concern about the Ninth Circuit's analysis, not because the analysis was unreasonable, but rather because it was indicative of a broader problem. *See Sandin,* 515 U.S. at 481, 115 S.Ct. 2293.[2] The Court said:

> By *shifting the focus* of the liberty interest inquiry to one based on the language of a particular regulation, and not the *nature of the deprivation,* the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various

state-conferred privileges. Courts have, in response, and not altogether illogically, drawn negative inferences from mandatory language in the text of prison regulations.

*Id.* (emphasis added). The Court then explained that "the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause." *Id.* at 483, 115 S.Ct. 2293.

The Supreme Court in *Sandin* did not overrule any prior decisions, but proclaimed that "[t]he time has come to return to the due process principles * * * correctly established and applied in *Wolff* and *Meachum.*" *Id.* The Court stated:

> [State-created liberty] interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force * * * nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* at 484, 115 S.Ct. 2293. Accordingly, the Court rejected the approach of focusing narrowly on the language of a particular statute, and instead focused its liberty analysis on the nature of the deprivation at issue; that is, the degree to which that deprivation caused a departure from the basic conditions of the inmate's sentence. *See id.* at 485, 115 S.Ct. 2293.[3]

---

2. The broader problem was rooted in the implicit reasoning of the Supreme Court's decision in *Greenholtz,* 442 U.S. at 11–12, 99 S.Ct. 2100, and made explicit in later cases. *See, e.g., Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Olim v. Wakinekona,* 461 U.S. 238, 249–50, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Thompson,* 490 U.S. at 454, 109 S.Ct. 1904.

3. The dissent, by making the language of Minn.Stat. § 244.101, subd. 3, the lynchpin of its analysis, effectively turns *Sandin* on its head. Instead of examining the nature of the deprivation at issue in the context of the statutory scheme as the Supreme Court in *Sandin* encouraged courts to do henceforth, the dissent allows the language of Minn.Stat. § 244.101, subd. 3, to entirely negate the pos-

In *Sandin*, the Supreme Court noted that the inmate's segregated confinement did not exceed similar discretionary confinement in either duration or degree of restriction and did not inevitably lead to an extension of the inmate's overall period of confinement. *Id.* at 486–87, 115 S.Ct. 2293. The Court noted that under the Hawai'i statute, the cause-effect relationship between the outcome of the disciplinary proceedings and any possible extension of an inmate's period of confinement is "simply too attenuated to invoke the procedural guarantees of the Due Process Clause." *Id.* at 487, 115 S.Ct. 2293. The Court stated that the decision to release the inmate rests on "a myriad of considerations," and the inmate is afforded procedural protections at a parole hearing during which he has an opportunity to explain the circumstances behind his misconduct. *Id.* Thus, the Court held that neither the prison regulation in question nor the Due Process Clause itself created a protected liberty interest that would entitle the inmate to the procedural protections set forth in *Wolff.* *Id.*

■ Based on the due process principles articulated in *Sandin*, we conclude that it is inappropriate to analyze Carrillo's liberty interest by looking solely to statutory language; rather, we must examine the nature of the deprivation and the extent to which that deprivation departs from the basic conditions of Carrillo's sentence. Under the Minnesota statutory scheme used to impose Carrillo's sentence, sentences presumptively consist of a specified minimum term of imprisonment equal to two-thirds of the executed sentence and a specified maximum term of supervised release equal to one-third of the executed sentence. *See* Minn.Stat. § 244.101, subd. 1. Under this scheme, an inmate's term of imprisonment may be extended by the commissioner only if the inmate commits a disciplinary offense. *See* Minn.Stat. §§ 244.101, subd. 2; 244.05, subd. 1(b). In fact, our courts are required to explain the following at sentencing:

(1) the total length of the executed sentence; (2) the amount of time the defendant will serve in prison; and (3) the amount of time the defendant will serve on supervised release, *assuming the defendant commits no disciplinary offense in prison that results in the imposition of a disciplinary confinement period.*

Minn.Stat. § 244.101, subd. 2 (emphasis added). The statute provides further guidance, stating: "[t]he court shall also explain that the amount of time the defendant actually serves in prison may be extended by the commissioner if the defendant commits any disciplinary offenses in prison." *Id.*

■ Here, the commissioner found that Carrillo committed a disciplinary offense and extended his incarceration time by seven days. In examining the nature and extent of Carrillo's deprivation, it becomes apparent that it is dissimilar to that in *Sandin*. The deprivation in *Sandin* involved the punishment of disciplinary segregation, and thus involved only the conditions under which the inmate served his time while in prison. 515 U.S. at 475–76, 115 S.Ct. 2293.[4] In *Sandin*, the Supreme Court concluded that the disciplinary segregation was not a departure from the basic conditions of the inmate's sentence,

---

sibility that there may have been a deprivation that implicates due process principles.

4. Carrillo's deprivation is similar to the deprivation in *Sandin* with respect to the 23 days that Carrillo spent in disciplinary segregation, but different from the deprivation in *Sandin* in that Carrillo's date of release from prison was extended by seven days.

and that the punishment did not "inevitably affect" the duration of his sentence. *Id.* at 487, 115 S.Ct. 2293.

It appears to us that Carrillo's deprivation is more similar to the deprivation experienced by the inmate in *Wolff*, where the Supreme Court held that the inmate had a liberty interest in the date of his release from prison. Thus, a further comparison between this case and *Wolff* is in order. Under the Nebraska statute examined in *Wolff*, inmates would accrue good time credits at a rate of two months for the first and second years of good behavior, three months for the third year, and four months for every year thereafter. *See Wolff*, 418 U.S. at 546 n. 6, 94 S.Ct. 2963 (citing Neb.Rev.Stat. § 83–1107 (Cum.Supp.1972)). The forfeiture or withholding of those good time credits affects the length of the term of imprisonment. *Wolff*, 418 U.S. at 547, 94 S.Ct. 2963.[5] When it examined Nebraska's sentencing scheme, the Court determined that the system of good time credits created a liberty interest strong enough to require due process protection. *Id.* at 558, 94 S.Ct. 2963.

■ The Nebraska sentencing scheme which the Supreme Court held to create a liberty interest contains a subtle but significant liberty interest difference from that in Minnesota's sentencing scheme—a difference which arguably may create an even greater liberty interest for Carrillo. Under the sentencing scheme at issue in *Wolff*, good time credits *only accrued if an inmate did not commit a disciplinary offense*. *See* Neb.Rev.Stat. § 83–1107. By contrast, under Minnesota's current sentencing scheme, there is a presumption from the moment that a court imposes and explains the sentence that the inmate will be released from prison on a certain date—and that presumption is overcome only if the inmate commits a disciplinary offense. While the distinction is subtle, we conclude that due to the presumptions that underlie Minnesota's sentencing scheme, Carrillo has an even stronger liberty interest at stake than did the inmate in *Wolff*, and accordingly any extension of his incarceration implicates due process protection.[6]

---

**5.** We note that in Minnesota, an inmate sentenced for crimes committed before 1993 shall have his sentence "reduced in duration by one day for each two days during which the inmate violates none of the disciplinary offense rules promulgated by the commissioner." Minn.Stat. § 244.04, subd. 1 (2004). Such a reduction in sentence length is analogous to the reduction due to "good time credits" in *Wolff*. Carrillo was convicted in 1999, and therefore this statute is not applicable to him. But we cite the statute for purposes of comparison with the current Minnesota sentencing scheme and the sentencing scheme the Supreme Court considered in *Wolff*. *See* Footnote 7.

**6.** Contrary to the dissent's assertion, the majority does not "bifurcate the analysis" by treating the statute and the nature of the deprivation separately. Our analysis is informed by our observation that the statutory scheme *establishes the basis for evaluating* the nature of the deprivation, and thus we consider both together. Punishment schemes are imposed by statute; thus, the deprivation caused when an inmate's supervised release date is extended does not and cannot occur in a vacuum. If an inmate's established date of supervised release were arbitrary and could be modified by the commissioner for any reason or for no reason at all, or if the legislature did not clearly delineate the 2/3 imprisonment and 1/3 supervised release scheme in the statute, then the extension of that inmate's likely date of supervised release may not represent a departure from the basic conditions of his sentence. But it is precisely because Minnesota's statutory scheme sets up an ordered, standardized, clearly delineated system—under which an inmate *will be released* from prison on the date that he was informed by the judge at sentencing that he would be released *unless he commits a disciplinary offense*—that the extension of Carrillo's supervised release date represents a departure

We recognize that Minnesota's sentencing scheme contains a short provision entitled "No right to supervised release" that declares that "[n]otwithstanding the court's explanation of the potential length of a defendant's supervised release term, the court's explanation creates no right of a defendant to any specific, minimum length of a supervised release term." Minn.Stat. § 244.101, subd. 3. But the statutes, taken as a whole, plainly establish a sentencing scheme under which an inmate *will serve* two-thirds of his executed sentence in prison and one-third on supervised release *unless* he commits a disciplinary offense while in prison. Therefore, we are left with two possible ways to interpret section 244.101, subd. 3. Either there is a difference between a "liberty interest" and a "right" which makes it possible to reconcile that provision with the rest of the sentencing scheme, or "liberty interest" and "right" are interchangeable and the legislature has established a sentencing scheme that is internally inconsistent. Our interpretation both gives the legislature the benefit of the doubt and harmonizes section 244.101, subd. 3, with the rest of the statutory scheme.[7]

For all of the foregoing reasons, we conclude that, similar to the inmate in *Wolff* and unlike the inmate in *Sandin*, Carrillo has experienced a deprivation that "inevitably affects" the length of his term of imprisonment because his date of release from prison was extended by seven days as an *immediate consequence* of the disciplinary action against him. In reaching our conclusion, we recognize that seven days of additional incarceration time may not appear long relative to two-thirds of a 114–month sentence, but it is important to emphasize that we conclude any extension of an inmate's period of imprisonment represents a significant departure from the basic conditions of the inmate's sentence. *Cf. Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). Therefore, we hold that under the Due Process Clause of the United States Constitution, Carrillo has a protected liberty interest in his supervised release date that triggers a right to procedural due process before that date can be extended. Because we have reached this holding under the U.S. Constitution, we conclude that it is unnecessary to analyze Carrillo's liberty interest under the Minnesota Constitution, and therefore we decline to do so.

II.

Having concluded that Carrillo has a protected liberty interest in his supervised release date under the United States Constitution, we turn now to the issue of whether the DOC's "some evidence" standard of proof offers sufficient protection of that interest. The purpose of a standard of proof for a particular type of adjudication is to instruct the fact finder

---

from the basic conditions of his sentence. Moreover, it follows that Carrillo's deprivation under the current—post–1993—Minnesota statutory scheme is more severe than is an inmate's deprivation under the statutory scheme in *Wolff* because Carrillo was given a more concrete expectation of release than was the inmate in *Wolff*.

**7.** The dissent asserts that the majority ignores the statutory construction canon directing the court to construe every statute to give effect to all of its provisions; yet it is the dissent's analysis that appears to offend that canon. *See* Minn.Stat. § 645.16 (2004). By making section 244.101, subd. 3, the decisive provision, the dissent leaves nothing to prevent the commissioner from extending an inmate's date of supervised release for any reason or for no reason whatsoever. Such a result renders meaningless other statutory provisions that make it clear that the commissioner may extend an inmate's date of supervised release only if the inmate has committed a disciplinary offense. *See* Minn.Stat. §§ 244.101, subd. 2; 244.05, subd. 1(b) (2004).

on the degree of confidence our society desires the fact finder to have in the correctness of his or her conclusions. *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The standard of proof "serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Id.*

▮ The evolution of our law has produced three basic standards of proof: preponderance of the evidence, clear and convincing, and beyond a reasonable doubt. *Id.* at 423–24, 99 S.Ct. 1804. The Supreme Court stated that civil cases typically use the preponderance of the evidence standard because society has a "minimal concern" with the outcome of private suits. *Id.* at 423, 99 S.Ct. 1804. Criminal cases employ the beyond a reasonable doubt standard because the defendant's interests are so strong that the likelihood of erroneous judgment must be minimized as much as possible. *Id.* at 423–24, 99 S.Ct. 1804. Civil cases involving allegations of fraud or other quasi-criminal wrongdoing may use the intermediate clear and convincing evidence standard because the defendant's interests at stake in those cases are more substantial than those present in a typical civil case. *Id.* at 424, 99 S.Ct. 1804.

▮ The DOC policy specifies that a fourth standard of proof—"some evidence"—shall be used in hearings on major violations of prison disciplinary rules. This standard allows a hearing officer to find that an inmate violated a disciplinary rule if there is some credible evidence presented to show that the inmate committed the offense charged. Thus, as a standard of proof, "some evidence" is much less exacting than the preponderance of the evidence standard used in civil cases.

The Supreme Court addressed the "some evidence" standard with respect to prison disciplinary hearings in *Superinten-*

*dent, Massachusetts Correctional Institution at Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). In *Hill,* the Court held that the requirements of due process are satisfied if some evidence supports a decision by a prison disciplinary board to revoke good time credits. *Id.* at 455, 105 S.Ct. 2768. The Court explained that "[t]his standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced.'" *Id.* (citing *United States ex rel. Vajtauer v. Comm. of Immigration,* 273 U.S. 103, 106, 47 S.Ct. 302, 71 L.Ed. 560 (1927)). Additionally, the Court stated:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board.

*Hill,* 472 U.S. at 455–56, 105 S.Ct. 2768 (emphasis added).

Since the release of *Hill,* courts have interpreted its holding regarding the use of the "some evidence" standard differently. Some courts, such as the Eighth Circuit, have concluded that due process is satisfied if the fact finder, generally a prison disciplinary committee, bases its decision on the existence of "some evidence" in the record that shows that the inmate committed the offense charged. *See, e.g., Goff v. Dailey,* 991 F.2d 1437, 1442 (8th Cir.1993). The Eighth Circuit reasoned that prison administration would be unduly burdened and institutional interests possibly threatened if a more exacting evidentiary standard were required. *Id.* Additionally, the court noted that not all deprivations of interests protected by the Fourteenth Amendment require a full evidentiary hearing before an impartial deci-

sion-maker using a preponderance of the evidence or higher standard. *Id.* at 1440–41, *citing Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (concluding that an employer may terminate a tenured public employee for cause after giving the employee notice of the charges, an explanation of the evidence, and an opportunity for the employee to present his side of the story); *Goss v. Lopez,* 419 U.S. 565, 582, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (concluding that a school principal may deprive a student of a protected interest after informing the student of the accusations against him and "informally discuss[ing] the alleged misconduct with the student minutes after it has occurred"). The Eighth Circuit then concluded that prison inmates are not entitled to the level playing field created by a fully adversarial proceeding using a preponderance of the evidence standard, and that the "some evidence" standard is appropriate for use at the fact-finding level. *Id.* at 1441.

Though the Eighth Circuit and some other courts have concluded that the "some evidence" standard is appropriate at the fact-finding level, the prevailing view is that the standard is only suitable for use by an appellate court in the context of reviewing lower court decisions. Courts espousing this view interpret *Hill* as addressing the "some evidence" stan-

dard solely in the context of judicial review of prison administration decisions. *See Brown v. Fauver,* 819 F.2d 395, 399 n. 4 (3rd Cir.1987); *Kodama v. Johnson,* 786 P.2d 417, 420 (Colo.1990); *Harper v. State,* 397 N.W.2d 740, 743 (Iowa 1986). The Vermont Supreme Court carefully analyzed *Hill,* and concluded that *Hill* addressed the appropriate standard for judicial review of the actions of prison authorities rather than the proof necessary for a fact finder to conclude that an inmate violated a disciplinary rule. *LaFaso v. Patrissi,* 161 Vt. 46, 633 A.2d 695, 697–98 (1993). The Vermont court went on to state that "[t]he safest reading of the Supreme Court's ambiguous analysis is that *Hill* does not purport to resolve the question one way or the other." *Id.* at 698. The court then engaged in its own analysis on the due process issue. *Id.* Indeed, citing *Hill,* the Supreme Court recently explained in a plurality opinion that it has utilized the "some evidence" standard not as a standard of proof, but rather as a standard of review when examining an administrative record developed after an adversarial proceeding. *Hamdi v. Rumsfeld,* 542 U.S. 507, 124 S.Ct. 2633, 2651, 159 L.Ed.2d 578 (2004).[8]

■ We agree with the prevailing view and conclude that *Hill* addressed only the

---

**8.** The Supreme Court used the following language in explaining the "some evidence" holding of *Hill:*

Because we conclude that due process demands some system for a citizen detainee to refute his classification, the proposed "some evidence" standard is inadequate. Any process in which the Executive's factual assertions go wholly unchallenged or are simply presumed correct without any opportunity for the alleged combatant to demonstrate otherwise falls constitutionally short. As the Government itself has recognized, we have utilized the "some evi-

dence" standard in the past as a standard of review, not as a standard of proof. * * * That is, it primarily has been employed by courts in examining an administrative record developed after an adversarial proceeding—one with process at least of the sort that we today hold is constitutionally mandated in the citizen enemy-combatant setting. *See [Hill].* This standard therefore is ill suited to the situation in which a habeas petitioner has received no prior proceedings before any tribunal and had no prior opportunity to rebut the Executive's factual assertions before a neutral decisionmaker. *Hamdi,* 124 S.Ct. at 2651.

appropriateness of "some evidence" as a standard of appellate review, not a standard of proof. Therefore, we now seek to determine through our own analysis the appropriate fact-finding standard to be used by the DOC. To determine whether a standard of proof in a particular type of proceeding satisfies due process, the Supreme Court has prescribed a three-factor test that examines: (1) the private interest affected, (2) the risk of an erroneous deprivation of such interest, and (3) the government's interest. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

■■■ It is clear that the first factor is satisfied here, as we have already concluded that an inmate has a protected liberty interest in his date of supervised release. The Supreme Court has acknowledged that when an inmate has a liberty interest in good time credits, he also has a strong interest in assuring that the loss of his good time credits is not imposed arbitrarily because such a loss threatens his prospective freedom from confinement by extending the length of imprisonment. *See Hill,* 472 U.S. at 453, 105 S.Ct. 2768. Here, as a direct result of the DOC hearing officer's determination that Carrillo had engaged in disorderly conduct, Carrillo had seven days added to his term of incarceration.

■■■ Under the second factor, the risk of erroneous deprivation of an interest is high when the fact finder uses the "some evidence" standard. The Vermont Supreme Court in *LaFaso* noted: "It is difficult to conceive of an aspect of disciplinary procedure with a greater impact on the accuracy of fact-finding than the evidentiary standard on which the ultimate conclusion must be based." 633 A.2d at 699. We agree. Under the "some evidence" standard, a fact finder could conclude that an inmate has committed a disciplinary offense even when the greater weight of the evidence indicates that he did not. Indeed, the fact finder could reach this conclusion even when significantly more than the greater weight of the evidence indicates that the inmate is not guilty. Thus, the use of the "some evidence" standard might result in the extension of many inmates' terms of incarceration, even when there is a strong likelihood that these inmates have not committed a disciplinary offense. Under this standard of proof, the benefits of certain procedural safeguards provided by the DOC's rules, such as notice and opportunity to respond, are of no value when prison authorities can extend an inmate's term of incarceration for an alleged violation of a disciplinary rule even when the balance of the evidence fails to prove that the inmate committed the charged offense.

■■■ We turn now to the third and final factor, the government's interest. The Eighth Circuit in *Goff* noted that the government has an interest in assuring the safety of inmates and employees, as well as avoiding burdensome administrative requirements that might be susceptible to manipulation. *Goff,* 991 F.2d at 1441. But the government also has an interest in promoting fair procedures, and the government derives no benefit from disciplining inmates who have committed no offense. The institution's goals of preparing and rehabilitating inmates for re-entry into society are better achieved if they have been treated fairly. *Cf. McKune v. Lile,* 536 U.S. 24, 36, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (stating that rehabilitation is an important penological objective, and a prison program bearing a rational relation to that objective does not violate the privilege against self-incrimination as long as the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute

atypical and significant hardships in relation to the ordinary incidents of prison life). The "some evidence" standard sends the message to prison inmates as well as society at large that once an individual is convicted of a crime, he is presumed guilty of every subsequent allegation. This message runs contrary to fundamental principles of criminal law in the United States.

 Taking the Supreme Court's three factors into consideration, we conclude that the "some evidence" standard is inappropriate for use by the DOC at the fact-finding level. We conclude that the preponderance of the evidence standard better protects against an erroneous deprivation of an inmate's liberty interest in his supervised release date and does not impose an unacceptable burden on the DOC. Therefore, we conclude that a DOC hearing officer must find by a preponderance of the evidence that Carrillo has committed a disciplinary offense before the commissioner can extend the date of his supervised release. Accordingly, we hold that the district court and the court of appeals erred when they denied Carrillo's petition for a writ of habeas corpus.

Reversed.

ANDERSON, G. Barry, J., took no part in the consideration or decision of this case.

PAGE, Justice (concurring).

I agree with the majority's holding that a Minnesota prison inmate has a constitutionally protected interest in a specific supervised release date. But I write separately to comment on the dissent's conclusion that an inmate has no such right under Minnesota's statutes. In my view, the dissent's analysis is flawed.

The object of statutory construction is "to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2004). As such, we must construe statutes as a whole and give meanings to words and sentences in light of their context. *Christensen v. Hennepin Transp. Co., Inc.*, 215 Minn. 394, 409, 10 N.W.2d 406, 415 (1943). When the words of a statute are clear and free from all ambiguity, further construction is neither necessary nor permitted. *Owens ex rel. Owens v. Water Gremlin Co.*, 605 N.W.2d 733, 736 (Minn.2000). A statute's words and phrases are to be "construed according to rules of grammar and according to their common and approved usage." Minn.Stat. § 645.08(1) (2004).

Under Minn.Stat. § 244.101, subd. 1 (2004), an inmate must serve "a specified minimum term of imprisonment that is equal to two-thirds of the executed sentence," and a specified maximum supervised release term "subject to the provisions of section 244.05, subdivision 1b." Under Minn.Stat. § 244.05, subd. 1b (2004), for felony offenses committed on or after August 1, 1993, every inmate sentenced to prison "*shall* serve a supervised release term upon completion of the inmate's term of imprisonment and any disciplinary confinement period imposed by the commissioner" due to violation of disciplinary rules or failure to participate in a required rehabilitation program. (Emphasis added.) Read together, the language of section 244.101, subdivision 1, and section 244.05, subdivision 1b, is clear and free from ambiguity. An inmate, such as Carrillo, who is sentenced for a felony offense that occurred on or after August 1, 1993, has a right to be placed on supervised release after serving two-thirds of the executed sentence plus any disciplinary confinement period properly imposed by the Commissioner of Corrections. Although the inmate has no right to be placed on supervised release on a date certain, he or she does have a liberty

interest in being released pursuant to the terms of the statutory scheme. As the inmate is entitled to supervised release after serving two-thirds of the executed sentence plus any properly imposed disciplinary confinement period, so too is the Commissioner of Corrections obligated to place the inmate on supervised release after that time period. Any failure to do so would be a due process violation because the language of the statute creates a mandatory supervised release requirement. *See State v. Calmes,* 632 N.W.2d 641, 645, 648 (Minn.2001) ("[D]ue process may be violated when a defendant's sentence is enhanced after the defendant has developed a crystallized expectation of finality in the earlier sentence."); *State v. Humes,* 581 N.W.2d 317, 319 (Minn.1998) (concluding that the use of the word "shall" in the conditional release term statute made the conditional release term mandatory).

The dissent reads section 244.101, subdivision 1, and section 244.05, subdivision 1b, in conjunction with section 244.101, subdivision 2 (2004), to conclude, "[t]hese provisions clearly demonstrate that there is no statutory right to a specified period of supervised release." That conclusion is wrong. Minnesota Statutes § 244.101, subdivision 2, provides:

> When a court pronounces an executed sentence under this section, it *shall explain:* (1) the total length of the executed sentence; (2) the amount of time the defendant will serve in prison; and (3) the amount of time the defendant will serve on supervised release, assuming the defendant commits no disciplinary offense in prison that results in the imposition of a disciplinary confinement period. The court *shall also explain*

that the amount of time the defendant actually serves in prison may be extended by the commissioner if the defendant commits any disciplinary offenses in prison and that this extension could result in the defendant's serving the entire executed sentence in prison.

(Emphasis added.) Thus, section 244.101, subdivision 2, merely confirms the application of section 244.05, subdivision 1b, and requires the sentencing court to explain to the defendant the requirements of section 244.05, subdivision 1b. In support of its conclusion, the dissent cites to section 244.101, subdivision 3 (2004), which provides that "[*n*]*otwithstanding the court's explanation* of the potential length of the defendant's supervised release term, *the court's explanation* creates no right of a defendant to any specific, minimum length of a supervised term." (Emphasis added.) Construing subdivision 3 in the context of section 244.101, it is clear that subdivision 3 only provides that the court's *explanation* does not create a right to a specific minimum length of a supervised release term. Subdivision 3 places no limits on the requirements of section 244.05, subdivision 1b. Section 244.101, subdivision 3, likely reflects the legislature's concern that any error in a sentencing court's explanation should not lead a defendant to claim a right to a particular supervised release term. An example, by way of analogy, illustrates this point. We have held that when a defendant is convicted of a crime that carries with it a conditional release term and the sentencing court fails to impose the conditional release term at the sentencing hearing, the conditional release is nonetheless mandatory and nonwaivable.[1] *See Calmes,* 632 N.W.2d at 649.

---

1. We have recognized that the defendant has the right to the benefit of the bargain of his or her plea agreement. *See, e.g., State v. Wukawitz,* 662 N.W.2d 517, 520, 522 (Minn.2003)

(holding that where imposition of mandatory conditional release term would violate a plea agreement and a plea withdrawal would unduly prejudice the state, the district court has

Section 244.101, subdivision 3, like our holding in *Calmes,* makes it clear that an error by the sentencing court in explaining the minimum period of incarceration and the maximum period of supervised release creates no right in the defendant to any specific minimum length of supervised release.

Because section 244.05, subdivision 1b, creates a liberty interest in being released after an inmate has served the term of imprisonment plus any disciplinary confinement period properly imposed by the commissioner, Carrillo is entitled to review of the propriety of the imposed discipline.

BLATZ, Chief Justice (dissenting).

"[T]he interest of prisoners in disciplinary procedures is not included in that 'liberty' protected by the Fourteenth Amendment." *Wolff v. McDonnell,* 418 U.S. 539, 556–57, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Only a statute can create a liberty interest in a specified date of supervised release, which gives rise to due process procedural protections before that date can be extended for violating a disciplinary rule. *See Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Wolff,* 418 U.S. at 557, 94 S.Ct. 2963. Because I believe Minnesota's statutes do not create a liberty interest in a specified date of supervised release, I respectfully dissent.

Critical to the analysis of the question before this court are the United States Supreme Court decisions in *Wolff,* 418 U.S. at 539, 94 S.Ct. 2963, and *Sandin,* 515 U.S. at 472, 115 S.Ct. 2293. In *Wolff,* the Su-

preme Court addressed whether Nebraska's prison disciplinary procedures complied with due process. 418 U.S. at 555, 94 S.Ct. 2963. The Court concluded that, while the federal constitution does not guarantee an inmate good-time credit for satisfactory behavior in prison, a state can provide a statutory right to good-time credit, giving rise to a protectible liberty interest. *Id.* at 556–57, 94 S.Ct. 2963.

In determining whether Nebraska's statutes had in fact created a liberty interest, the Supreme Court looked at relevant provisions of the Nebraska statute, which expressly provided for good time stating that:

> The chief executive officer of a [correctional] facility *shall* reduce, for parole purposes, for good behavior and faithful performance of duties while confined in a facility the term of a committed offender.

*Id.* at 546 n. 6, 94 S.Ct. 2963 (quoting Neb.Rev.Stat. § 83—1,107 (Cum.Supp. 1972)) (emphasis added). The "good-time" reduction by statute could only be forfeited if a disciplinary committee found that the inmate had been engaged in "flagrant or serious misconduct." *Id.* at 545 n. 5, 94 S.Ct. 2963 (quoting Neb.Rev.Stat. § 83–185 (Cum.Supp.1972)).

After reviewing these provisions of the Nebraska statute, the Court stated:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time

discretion to impose a conditional release term shorter than the statutory minimum); *State v. Jumping Eagle,* 620 N.W.2d 42, 45 (Minn.2000). This is so because "if a guilty plea is induced by a government promise, such a promise must be fulfilled or due process is violated." *Wukawitz,* 662 N.W.2d at 522. As a result, under certain circum-

stances, the terms of the mandatory and non-waivable conditional release may not be imposed. The defendant's right to the benefit of the plea bargain derives from the defendant's right to due process, and not from some right created by the court's explanation of the potential length of the defendant's sentence.

but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Id.* at 557, 94 S.Ct. 2963 (citation omitted). Thus, in holding that the prisoner was entitled to "the minimum requirements of procedural due process appropriate for the circumstances," the Court focused on the fact that the Nebraska statute created a statutory right to good time and the statute specified that good time could be forfeited only for "serious misconduct." *Id.* at 558, 94 S.Ct. 2963.

In *Sandin v. Conner*, the Supreme Court again addressed whether prison disciplinary procedures implicated a liberty interest, requiring procedural protections under the Due Process Clause. 515 U.S. at 487, 115 S.Ct. 2293. The prisoner in *Sandin*, Demont Connor, challenged the imposition of disciplinary segregation for misconduct. The prison regulation in question required a finding of guilt when the allegation of misconduct was "supported by substantial evidence." *Id.* at 475–77, 115 S.Ct. 2293. Although Connor was not allowed to present witnesses at the disciplinary hearing, a fact-finding committee nonetheless found him guilty of

misconduct and put him in disciplinary segregation. *Id.* at 475–76, 115 S.Ct. 2293. Connor brought an action against the prison officials in federal district court alleging a deprivation of procedural due process in connection with the disciplinary hearing. *Id.* at 476, 115 S.Ct. 2293. The federal district court granted the state's motion for summary judgment in favor of the prison officials, but the Ninth Circuit reversed. *Id.* The Ninth Circuit concluded that Connor had a liberty interest in remaining free from disciplinary segregation and therefore held that the inmate was entitled to call witnesses at the disciplinary hearing pursuant to *Wolff. Id.* at 476–77, 115 S.Ct. 2293.

In reversing the Ninth Circuit, the Supreme Court noted that the Ninth Circuit's holding that the inmate was entitled to procedural protections set forth in *Wolff* was based on an incorrect "negative inference that the [disciplinary] committee may not impose segregation if it does not find substantial evidence of misconduct." *Id.* at 477, 115 S.Ct. 2293. It was this "negative inference" creation of a liberty interest by the Ninth Circuit that the United States Supreme Court rejected in *Sandin*, stating:

Inferr[ing] from the mandatory directive that a finding of guilt "shall" be imposed under certain conditions the conclusion that the absence of such conditions prevents a finding of guilt * * * may be entirely sensible in the ordinary task of construing a statute defining rights and remedies available to the general public. It is a good deal less sensible in the case of a prison regulation primarily designed to guide correctional officials in the administration of a prison. Not only are such regulations not designed to confer rights on inmates, but the result of the negative implication jurisprudence is not to require the prison officials to follow

the negative implication drawn from the regulation, but is instead to attach procedural protections that may be of quite a different nature.

*Id.* at 481–82, 115 S.Ct. 2293. Again recognizing that states can create liberty interests protected by the Due Process Clause, the Court concluded that "Connor's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.* at 486, 115 S.Ct. 2293. Thus, the Court held that "neither the Hawaii prison regulation in question, nor the Due Process Clause itself, afforded [the defendant] a protected liberty interest that would entitle him to the procedural protections set forth in *Wolff.*" *Id.* at 487, 115 S.Ct. 2293.

While the United States Supreme Court has clearly ruled that state statutes are the source of any due process right to be accorded to inmates in prison disciplinary procedures, the majority nonetheless states that "it is inappropriate to analyze Carrillo's liberty interest by looking solely to statutory language; rather, we must examine the nature of the deprivation and the extent to which that deprivation departs from the basic conditions of Carrillo's sentence." In so stating, the majority in effect interprets *Wolff* and *Sandin* as creating an analytical framework that has two separate legal considerations: (1) the statutory right and (2) the nature of the deprivation. Using this framework, the majority then concludes that Carrillo has a liberty interest in a specific supervised release date. This framework, I respectfully submit, is not grounded in or supported by Supreme Court precedent because the Court's precedent does not bifurcate the analysis, but rather looks to the statute to see if there has been a deprivation. Accordingly, because a liberty interest, if created, is created by state statute, I begin by analyzing the applicable Minnesota statutes to determine whether they provide a protectible entitlement to a specified date of supervised release.

Under Minnesota statutes, an executed sentence "consists of two parts: (1) a specified minimum term of imprisonment that is equal to two-thirds of the executed sentence; and (2) a specified maximum supervised release term that is equal to one-third of the executed sentence." Minn. Stat. § 244.101, subd. 1 (2004). Importantly, the statutes provide that "[t]he amount of time the inmate actually serves in prison and on supervised release is subject to the provisions of [Minn.Stat.] § 244.05, subd. 1b." Minn.Stat. § 244.101, subd. 1. Section 244.05 provides that an inmate convicted for a crime committed after August 1, 1993, "shall serve a supervised release term upon completion of the inmate's term of imprisonment *and* any disciplinary confinement period imposed by the commissioner due to the inmate's violation of any disciplinary rule adopted by the commissioner." Minn.Stat. § 244.05, subd. 1b (2004) (emphasis added). Minnesota statutes further require that the district court explain the two parts of the sentence—the minimum term of imprisonment and the maximum term of supervised release—to the defendant when the sentence is pronounced. Minn.Stat. § 244.101, subd. 2 (2004). As set forth in the statute, at sentencing the court must specifically "explain that the amount of time the defendant actually serves in prison may be extended by the commissioner if the defendant commits any disciplinary offenses in prison." *Id.* These provisions clearly demonstrate that there is no statutory right to a specified period of supervised release.

Reinforcing this clear expression of legislative intent is the statutory provision entitled "No right to supervised release" which provides: "Notwithstanding the court's explanation of the potential length

of a defendant's supervised release term, the court's explanation creates no right of a defendant to any specific, minimum length of a supervised release term." Minn.Stat. § 244.101, subd. 3 (2004). In my view, this statement and the totality of the other relevant statutory provisions is determinative of the issue before us; the legislature clearly did not intend to create a liberty interest in a specified date of supervised release.

The majority's reliance on *Sandin* to look at the "deprivation"[1] suffered by the defendant, notwithstanding the plain language of our statute stating there is "no right," ignores the holding of *Wolff*—that there is no right to supervised release unless it is created by the state. Thus, the majority's analysis is in direct conflict with *Wolff* and, in consequence, with the Supreme Court's statement in *Sandin* that "the time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.*" *Sandin*, 515 U.S. at 483, 115 S.Ct. 2293. Moreover, by ignoring the express language that there is "no right," the majority violates the canon of construction that we construe every law to give effect to *all* its provisions. Minn.Stat. § 645.16 (2004) (emphasis added).[2]

In summary, there can be no deprivation if there is no constitutional or statutory right.[3] Indeed, there can be no deprivation where our statute specifically provides that a defendant has "no right * * * to any specific, minimum length of a supervised release term." Minn.Stat. § 244.101, subd. 3. With such statutory language, I cannot conclude that an inmate was deprived, much less that, as the majority concludes, the deprivation caused "a significant departure from the basic conditions of the inmate's sentence."

While it may be preferable policy or practice to have such a statutory right, it is not the responsibility of this court to create one. It is our responsibility to afford inmates the process necessary to protect any right created by statute. Here, no right is created and I would so hold.

ANDERSON, Russell A., J. (dissenting). I join the dissent of Chief Justice Blatz.

---

1. The majority states: "It appears to us that Carrillo's deprivation is more similar to the deprivation experienced by the inmate in *Wolff*, where the Supreme Court held that the inmate had a liberty interest in the date of his release from prison." While his deprivation may be similar, the statutes are not. Unlike Minnesota Statutes, Nebraska's statute did not contain a provision stating that the prisoner had "no right" to supervised release, but in fact expressly provided that the chief executive officer of a prison "shall reduce" an inmates sentence for good behavior. *Wolff*, 418 U.S. at 546 n. 6, 94 S.Ct. 2963.

2. The majority suggests that the statute is "internally inconsistent" if not interpreted to provide a liberty interest to Carrillo despite the provision stating that there is "no right." However, the Supreme Court in *Sandin* recognized that while there may be prison regulations "designed to guide correctional officials in the administration of a prison," "such regulations [are] not designed to confer rights on inmates." *Sandin*, 515 U.S. at 481–82, 115 S.Ct. 2293. Similarly, our statute is not designed to confer rights on inmates.

3. The majority distinguishes a "liberty interest" from a "right" in order to circumvent the legislature's express language that there is "no right." In doing so, the majority concludes that while there is no "right" to supervised release, an inmate has a "liberty interest" in a specific period of supervised release. This is inconsistent with the Supreme Court's decision in *Wolff* where the Court concluded that the inmate had an interest of "real substance" *because* the state "created the *right* to good time." *Wolff*, 418 U.S. at 557, 94 S.Ct. 2963.