Frank Edward JOHNSON, Respondent,

v.

Joan FABIAN, Commissioner
of Corrections, et al.,
Appellants.

and

State of Minnesota, ex rel. John
William Henderson,
Appellant,

v.

Joan Fabian, Commissioner of
Corrections, Respondent.

Nos. A05–2498, A06–439.

Supreme Court of Minnesota.

June 28, 2007.

Bradford William Colbert, L.A.M.P., St. Paul, MN, for Appellants Frank Edward Johnson's and John William Henderson.

Brent Dean Wartner, Director, Policy and Legal Services, Eric Lee Lipman, State Sex Offender Policy Coordinator, St. Paul, MN, for Respondent Joan Fabian, Commissioner of Corrections.

Kaarin Sherrill Long, Minnesota Coalition Against Sexual Assault, St. Paul, MN, for Amicus Minnesota Coalition Against Sexual Assault.

## OPINION

ANDERSON, RUSSELL A., Chief Justice.

In these consolidated cases, we are asked to determine whether the Fifth Amendment privilege against self-incrimination of two inmates of the Minnesota Department of Corrections was violated by the extension of the inmates' periods of incarceration as a disciplinary sanction for refusal to admit or discuss the inmates' crimes of conviction in a sex offender treatment program. The court of appeals held in *Johnson v. Fabian*, No. A05–2498, that Johnson's privilege against self-incrimination was violated because the direct appeal of his conviction was still pending at the time he was required to admit his offense in treatment. We affirm. The court of appeals held in *State ex rel. Henderson v. Fabian*, No. A06–439, that Henderson's Fifth Amendment right was not violated because his direct appeal was completed by the time he was required to admit his offense. We reverse, because Henderson had testified at trial that he did not commit the crime and admission of the offense in treatment would therefore have exposed him to prosecution for perjury.

### Johnson v. Fabian

Frank Edward Johnson was convicted of fifth-degree assault, third-degree criminal sexual conduct, and first-degree burglary after a jury trial. The court executed a 58–month sentence and committed Johnson to the custody of the Commissioner of Corrections ("the Commissioner") on Feb-

ruary 6, 2003. Johnson filed a direct appeal of his conviction on May 7, 2003. While Johnson's appeal was pending, the Commissioner ordered that Johnson complete the prison-based sex offender treatment program (SOTP), with the expectation that he admit the offense and discuss the criminal acts that resulted in his conviction as part of that treatment program.

In the summer of 2003, Johnson resisted participation in the SOTP because the direct appeal of his conviction was pending and he did not want to admit his offense in treatment. As a result of Johnson's refusal to participate in the SOTP, the Commissioner imposed a disciplinary sanction in the form of 45 days of extended incarceration. On May 18, 2004, the court of appeals reversed Johnson's burglary conviction, but affirmed his assault and criminal sexual conduct convictions, and this court denied review. *State v. Johnson*, 679 N.W.2d 378, 389 (Minn.App.2004), *rev. denied* (Minn. Aug. 17, 2004).

On June 24, 2005, Johnson filed a petition for writ of habeas corpus in state district court challenging the 45–day extension of his incarceration. The district court concluded that the extension of Johnson's incarceration did not constitute compulsion for purposes of the privilege against self-incrimination and therefore denied his petition. Johnson appealed to the court of appeals, which reversed and remanded for recalculation of Johnson's supervised release date, holding that extended incarceration constitutes compulsion. *Johnson v. Fabian*, 711 N.W.2d 540, 545 (Minn.App.2006). We affirm.

### State ex rel. Henderson v. Fabian

John William Henderson was charged with first-degree criminal sexual conduct. During his jury trial, on January 25, 2002, Henderson testified that he had never had any type of sexual contact with the victim. Henderson was convicted, received an exe-

cuted sentence of 91 months, and was committed to the custody of the Commissioner. Henderson's conviction was affirmed by the court of appeals on direct appeal on May 6, 2003, and this court denied review on July 15, 2003. *State v. Henderson*, No. C5–02–780, 2003 WL 21005327 (Minn.App. May 6, 2003), *rev. denied* (Minn. July 15, 2003). His direct appeal right was exhausted 90 days later when the deadline to petition the United States Supreme Court for a writ of certiorari expired.

On November 5, 2003, Henderson refused to enter the SOTP, later claiming that his refusal was based on his Fifth Amendment privilege against self-incrimination. On December 11, 2003, the Commissioner disciplined Henderson for his refusal to participate in the SOTP by imposing a 45–day extension of incarceration. Sometime after the imposition of this sanction, Henderson filed a habeas corpus petition in federal court attacking his conviction. The petition was denied on July 25, 2005.

On October 19, 2005, Henderson filed a habeas corpus petition in state district court challenging the 45–day extension of his incarceration. Relying on *State ex rel. Morrow v. LaFleur*, 590 N.W.2d 787 (Minn.1999), the district court concluded that extension of incarceration did not constitute compulsion and denied Henderson's petition for a writ of habeas corpus. Henderson appealed and the court of appeals affirmed, holding that Henderson no longer had a Fifth Amendment privilege against self-incrimination when the extension of incarceration was imposed upon him because his direct appeal had already been resolved. *State ex rel. Henderson v. Fabian*, 715 N.W.2d 128, 131–33 (Minn. App.2006). We reverse.

Prior to discussing the privilege against self-incrimination, it is first neces-

sary to describe briefly Minnesota's sentencing scheme and the Commissioner's prison-based sex offender treatment program. Under Minnesota's current sentencing scheme, the executed sentence of a felony offender consists of two parts, the term of imprisonment, which is equal to two-thirds of the executed sentence, and the term of supervised release, which is equal to one-third of the executed sentence. Minn.Stat. § 244.101, subd. 1 (2006). While the executed sentence can never be extended, an inmate's term of imprisonment can be extended if the inmate commits any disciplinary offenses while in prison. Minn.Stat. § 244.101, subd. 2 (2006). Such extensions can result in the inmate serving as much as the entire executed sentence in prison. *Id.* The district court must explain this sentencing scheme to defendants when it pronounces an executed sentence. *Id.* The Minnesota Sentencing Guidelines explain that section 244.101

> requires that the court pronounce the total executed sentence and explain the amount of time the offender will serve in prison and the amount of time the offender will serve on supervised release, assuming the offender commits no disciplinary offense in prison that results in the imposition of a disciplinary confinement period.

Minn. Sent. Guidelines IV.

■ After arrival at a Minnesota state prison, inmates are evaluated to determine the type of rehabilitative treatment that is appropriate. An inmate who is ordered to participate in sex offender treatment may be required to admit the offense, as well as discuss the specific acts, that resulted in conviction. *See Johnson,* 711 N.W.2d at 543. Refusal is a violation of the Offender

Disciplinary Regulations, which can result in the extension of an inmate's term of imprisonment.

## I.

■ The Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be witness against himself." U.S. Const. amend. V; *see also* Minn. Const. art. I, § 7.[1] "The essence of this basic constitutional principle is 'the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips.'" *Estelle v. Smith,* 451 U.S. 454, 462, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (emphasis omitted) (quoting *Culombe v. Connecticut,* 367 U.S. 568, 581–82, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)). The privilege allows an individual to refuse to " 'answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (quoting *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)).

■ In order for the privilege to apply, two distinct elements must be present—compulsion and incrimination. The privilege prohibits only statements that are compelled *and* that present a "real and appreciable" risk of incrimination. *Hiibel v. Sixth Judicial Dist. Court of Nev.,* 542 U.S. 177, 190, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (quoting *Brown v. Walker,* 161 U.S. 591, 599–600, 16 S.Ct. 644, 40 L.Ed.

---

1. While the inmates assert in their briefs that the Commissioner's extension of their incarceration violates the Minnesota Constitution as well as the Federal Constitution, they make no arguments specific to the Minnesota Constitution.

819 (1896)). Because the cases before the court present questions of both compulsion and incrimination, each issue will be addressed separately. We turn first to the issue of compulsion.

## II.

The Fifth Amendment does not prohibit all self-incriminating testimony; rather, it prohibits "only self-incrimination obtained by a 'genuine compulsion of testimony.'" *United States v. Washington*, 431 U.S. 181, 187, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977) (quoting *Michigan v. Tucker*, 417 U.S. 433, 440, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). The compulsion element of the privilege against self-incrimination is present when the state attaches sufficiently adverse consequences to the choice to remain silent that a person is compelled to speak. "[W]hen a State compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment * * *." *Lefkowitz v. Cunningham*, 431 U.S. 801, 805, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). Penalty situations occur when "the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and * * * compe[l] * * * incriminating testimony.'" *Murphy*, 465 U.S. at 434, 104 S.Ct. 1136 (quoting *Garner v. United States*, 424 U.S. 648, 661, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976)). For example, threatening to revoke an individual's probation for refusing to answer potentially incriminating questions would create a classic penalty situation. *Id.* at 435, 104 S.Ct. 1136.

In the so-called "penalty cases," the Supreme Court has held that the following consequences rise to the level of compulsion for purposes of the Fifth Amendment privilege against self-incrimination: termination of employment, *Uniformed Sanita-*tion Men Ass'n v. Comm'r of Sanitation of New York, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); loss of a professional license, *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); ineligibility to receive government contracts, *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); and loss of the right to participate in political association and to hold public office, *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977).

However, not all adverse consequences imposed by the state rise to the level of compulsion. *McKune v. Lile*, 536 U.S. 24, 49, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (O'Connor, J., concurring); *see Corbitt v. New Jersey*, 439 U.S. 212, 218–20, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978). Although the Supreme Court has consistently held that the potential loss of livelihood does rise to the level of compulsion, the Court has not clearly defined other classes of consequences that constitute compulsion. Rather, the Court has traditionally engaged in a case-by-case analysis to determine whether the pressure imposed rises to a level where it is likely to compel a person to be a witness against himself. *See McKune*, 536 U.S. at 49, 122 S.Ct. 2017 (O'Connor, J., concurring).

In *Morrow*, we were presented with the same compulsion question as presented in these cases, namely whether extension of an inmate's incarceration for refusal to fully participate in sex offender treatment constitutes compulsion under the Fifth Amendment. 590 N.W.2d at 789. We held in *Morrow* that "the loss of an opportunity for an earlier supervised release does not constitute a substantial penalty for purposes of the Fifth Amendment [privilege against self-incrimination]." *Id.* at 793. The inmates in the cases before us argue that after this court's decision in *Carrillo v. Fabian*, 701 N.W.2d 763 (Minn.

2005), and the Supreme Court's decision in *McKune v. Lile*, 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002), *Morrow* is no longer good law.

In *Morrow*, we held that a disciplinary sanction extending an inmate's incarceration for refusing to admit his offense as part of sex offender treatment while his conviction was on direct appeal did not constitute "compulsion" for Fifth Amendment purposes. 590 N.W.2d at 792–96. At the heart of the *Morrow* decision was the determination that Minnesota's statutory sentencing scheme does not provide prisoners with the right to a " 'specific, minimum length of a supervised release term.' " *Id.* at 793 (quoting Minn.Stat. § 244.101, subd. 3 (2004)). Rather, we observed that a prisoner's supervised release date is conditioned on compliance with prison rules, including participation in treatment programs. *Id.*

We held that "when Morrow received a 36–month sentence, those 36 months belonged presumptively to the state," and when the state deprived Morrow of an opportunity for earlier supervised release, such deprivation did not constitute a substantial penalty. *Id.* We characterized the nature of the claimed compulsion in *Morrow* as a "choice" and held that "Morrow had a choice between treatment and confinement for a larger portion of his sentence, and that the 'choice does not rise to the level of compulsion necessary in order to constitute a Fifth Amendment violation.' " *Id.* at 792 (quoting *Heddan v. Dirkswager*, 336 N.W.2d 54, 65 (Minn.1983)).

█ Six years later, in *Carrillo v. Fabian*, we decided a due process challenge brought by an inmate who claimed that the Commissioner failed to provide him with sufficient procedural process before extending his period of incarceration for a disciplinary violation. 701 N.W.2d at 766. We observed that in a due process analy-

sis,· we must first "determine whether the complainant has a liberty or property interest with which the state has interfered." *Id.* at 768. We stated that "Carrillo must have a legitimate claim of entitlement to being released from prison on his supervised release date before his interest in being released on that date can qualify as a liberty interest." *Id.* The Due Process Clause itself does not create liberty interests; rather, state law can create such a liberty interest that is protected by the Due Process Clause. *Carrillo*, 701 N.W.2d at 769 (citing *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Sandin v. Conner*, 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).

In deciding whether Carrillo had a liberty interest in his supervised release date, we applied the test adopted by the Supreme Court in another prisoner due process case, *Sandin v. Conner*, 515 U.S. at 483–86, 115 S.Ct. 2293. *Carrillo*, 701 N.W.2d at 770–71. In determining whether the inmate had a liberty interest to be free from segregated confinement, the Court asked in *Sandin* whether segregated confinement imposed "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293. In adopting this standard in *Carrillo*, we observed that "the Supreme Court has expressed its disapproval of the emphasis that courts have placed on the mandatory or discretionary nature of statutes in seeking to determine whether the state has created [a] liberty interest." *Carrillo*, 701 N.W.2d at 770 (citing *Sandin*, 515 U.S. at 479–84, 115 S.Ct. 2293). Rather than looking to the mandatory or discretionary nature of the statutory language, this "atypical and significant hardship" test looks to "the nature of the deprivation and the extent to which that deprivation departs

from the basic conditions of [the inmate's] sentence." *Carrillo,* 701 N.W.2d at 771.

To determine the basic conditions of an inmate's sentence, we looked to Minnesota's sentencing scheme and noted that "sentences presumptively consist of a specified minimum term of imprisonment equal to two-thirds of the executed sentence and a specified maximum term of supervised release equal to one-third of the executed sentence." *Id.* (citing Minn. Stat. § 244.101, subd. 1). Under the sentencing scheme, an inmate's term of imprisonment can be extended only if the inmate commits a disciplinary offense. *Id.* (citing Minn.Stat. §§ 244.101, subd. 2; 244.05, subd. 1b (2004)). We therefore held that under Minnesota's sentencing scheme, "there is a presumption from the moment that a court imposes and explains the sentence that the inmate will be released from prison on a certain date—and that presumption is overcome only if the inmate commits a disciplinary offense." *Id.* at 772. Concluding that extension of incarceration "represents a significant departure from the basic conditions of the inmate's sentence," we held that a Minnesota inmate has a "protected liberty interest in his supervised release date that triggers a right to procedural due process before that date can be extended." *Id.* at 773.

A plurality of the Supreme Court adopted the *Sandin* "atypical and significant hardship" test we applied in *Carrillo* for purposes of determining whether prison disciplinary consequences constituted compulsion in the context of an inmate's Fifth Amendment challenge in *McKune v. Lile,* 536 U.S. at 37–41, 122 S.Ct. 2017 (plurality opinion). In a 4–1–4 plurality decision, the Court concluded that a mandated prison sex offender treatment program that required a Kansas inmate to admit his offense did not "compel" the inmate's admission within the meaning of the Fifth Amendment. *McKune,* 536 U.S. at 30–36, 122 S.Ct. 2017; *id.* at 48–49, 122 S.Ct. 2017 (O'Connor, J., concurring). Under the Kansas program, the failure to admit sex crimes in treatment resulted in the inmate's loss of privileges within prison, but not extension of incarceration. *Id.* at 31, 38, 122 S.Ct. 2017 (plurality opinion).

In determining the proper test for identifying compulsion in the prison context, the *McKune* plurality noted that the "compulsion inquiry must consider the significant restraints already inherent in prison life" balanced against the state's interest in rehabilitation and prison procedures. *Id.* at 37, 122 S.Ct. 2017. The plurality reasoned that the "atypical and significant hardship" framework used in *Sandin* to assess whether a liberty interest was implicated for procedural due process purposes in prisoner litigation, though not "a precise parallel," provides "useful instruction" for determining whether adverse consequences imposed in the prison setting constitute compulsion under the Fifth Amendment. 536 U.S. at 37, 122 S.Ct. 2017. The plurality went on to adopt the *Sandin* test as a reasonable means to make the compulsion assessment, explaining that:

> [d]etermining what constitutes unconstitutional compulsion involves a question of judgment: Courts must decide whether the consequences of an inmate's choice to remain silent are closer to the physical torture against which the Constitution clearly protects or the *de minimis* harms against which it does not. The *Sandin* framework provides a reasonable means of assessing whether the response of prison administrators to correctional and rehabilitative necessities are so out of the ordinary that one could sensibly say they rise to the level of unconstitutional compulsion.

*Id.* at 41, 122 S.Ct. 2017. Additionally, the plurality incorporated the *Sandin* standard in its general statement that a prison rehabilitation program that bears "a rational relation to a legitimate penalogical objective, does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are related to the program objectives and *do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life.*" *Id.* at 37–38, 122 S.Ct. 2017 (emphasis added).

Because the denial of prison privileges at issue in *McKune* represented restrictions "inherent in prison life," the plurality held that they were not "atypical and significant hardships" and therefore did not amount to compulsion. *Id.* at 40–41, 122 S.Ct. 2017. In making this determination, the plurality noted that the disciplinary sanctions did not extend the inmate's incarceration and that no liberty interest was implicated in the case. *Id.* at 38–39, 122 S.Ct. 2017.

Justice O'Connor concurred in the judgment, but disagreed with the plurality's use of the *Sandin* standard to assess compulsion under the Fifth Amendment. Justice O'Connor stated that she agreed with Justice Stevens in dissent "that the Fifth Amendment compulsion standard is broader than the 'atypical and significant hardship' standard we have adopted for evaluating due process claims in prisons." *McKune,* 536 U.S. at 48, 122 S.Ct. 2017 (O'Connor, J., concurring). In other words, Justice O'Connor thought a broader test than the *Sandin* due process liberty interest standard should apply when determining whether disciplinary consequences imposed in prison constitute compulsion. Under Justice O'Connor's approach, disciplinary measures that constitute compulsion for Fifth Amendment purposes would include those that involve a liberty interest

as "atypical and significant hardship," and also a broader range of consequences. Having rejected the "atypical and significant hardship" standard as too narrow, Justice O'Connor applied a more general Fifth Amendment analysis, considering whether the consequences imposed on the Kansas inmate were the "types of penalties * * * capable of coercing incriminating testimony." *Id* at 49, 122 S.Ct. 2017. She concluded that the alterations in the inmate's prison conditions imposed in *McKune* "were [not] so great as to constitute compulsion for the purposes of the Fifth Amendment privilege against self-incrimination." *Id.* at 48–49, 122 S.Ct. 2017

Notably, Justice O'Connor also observed that the imposition of longer incarceration is a "far greater [penalty] than those we have already held to constitute unconstitutional compulsion in the penalty cases [and] would surely implicate a 'liberty interest.'" *Id.* at 52, 122 S.Ct. 2017. Although Justice O'Connor did not set forth a comprehensive theory of the Fifth Amendment privilege against self-incrimination, she did state that the under the Fifth Amendment, penalties imposed on an inmate could not "permissibly rise to the level" of longer incarceration without constituting compulsion. 536 U.S. at 52, 122 S.Ct. 2017.

The court of appeals in *Johnson v. Fabian* concluded that *McKune* effectively overruled the *Morrow* holding that extension of an inmate's incarceration by delaying supervised release does not constitute compulsion. 711 N.W.2d at 544. In reaching this conclusion, the court of appeals relied on the facts that (1) the *McKune* plurality noted that the sanctions imposed in that case did not extend the inmate's term of incarceration or affect eligibility for good-time credits or parole, and (2) Justice O'Connor noted that a

sanction involving longer incarceration would be a penalty far greater than those already held to constitute compulsion. *Johnson*, 711 N.W.2d at 543. Following the lead of several federal courts, the court of appeals reasoned that Justice O'Connor's concurrence is the holding of *McKune*. *Johnson*, 711 N.W.2d at 543. The court of appeals therefore appears to have concluded that the holding of *McKune* is that a consequence of longer incarceration constitutes compulsion for purposes of the Fifth Amendment. *See Johnson*, 711 N.W.2d at 543–44.

■ While we agree that the effect of *McKune*, in combination with our holding in *Carrillo*, is to overrule *Morrow*, we reach that conclusion by a somewhat different path. To understand *McKune's* impact here, we must first determine what aspect of the several rationales in *McKune* has precedential value. According to the narrowest grounds doctrine outlined in *Marks v. United States*, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of the five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Therefore, we must focus on the grounds stated by both the plurality opinion and the concurring opinion that were necessary to the judgment in *McKune*.

In our view, the comments about sanctions that extend the term of incarceration made by both the plurality and Justice O'Connor on which the court of appeals relied are dicta, because the case before the Court did not involve extended incarceration, but instead involved only lesser sanctions. *McKune*, 536 U.S. at 30–31,

122 S.Ct. 2017 (plurality opinion). Although the comments about extended incarceration may shed light on how those five Justices might rule on a case that does involve extended incarceration, those comments were neither the holding nor the rationale of either the plurality or concurring opinion. Rather, the plurality's rationale was that the *Sandin* test should be used to identify compulsion in the prison setting, and that under *Sandin*, the sanctions at issue did not constitute compulsion.

Justice O'Connor concurred in the judgment that the sanctions at issue did not constitute compulsion, but she disagreed with the application of the *Sandin* test because she considered the *Sandin* test too narrow for identifying compulsion under the Fifth Amendment. *See McKune*, 536 U.S. at 48, 122 S.Ct. 2017 (O'Connor, J., concurring). In other words, Justice O'Connor agreed with the plurality's rationale that a consequence that satisfies the *Sandin* "atypical and significant hardship" test would constitute compulsion for Fifth Amendment purposes. Her disagreement with the plurality was that she believed the test for compulsion should be *broader*, meaning that some consequences that do not satisfy the *Sandin* test may nevertheless constitute compulsion. While Justice O'Connor declined to articulate what the precise test should be, her endorsement of a broader test necessarily encompassed the narrower *Sandin* test.

We therefore conclude that the "[m]embers who concurred in the judgment[ ] on the narrowest grounds" were actually the plurality, in that they reached the same conclusion regarding the judgment as did Justice O'Connor, but using a narrower test than Justice O'Connor. That narrower test is the *Sandin* standard. Accordingly, based on the narrowest grounds doctrine, *McKune's* teaching is that in the

prison setting, a consequence that meets the *Sandin* "atypical and significant hardship" test is a consequence that constitutes compulsion for purposes of the Fifth Amendment.

For purposes of our analysis of this case, that interpretation of *McKune* is determinative. In *Carrillo* we held that under the Minnesota sentencing scheme the extension of an inmate's term of incarceration as a disciplinary sanction meets the *Sandin* test for a liberty interest because it is an atypical and significant hardship. *See* 701 N.W.2d at 770–71. In light of our holding in *Carrillo* that disciplinary extension of incarceration meets the *Sandin* test and the agreement of at least five members of the Supreme Court in *McKune* that the test for compulsion under the Fifth Amendment is *at least* as broad as the *Sandin* test, *Carrillo* and *McKune* in combination dictate the conclusion that *Morrow* is no longer good law.

The dissent disagrees, concluding that neither *McKune* nor *Carrillo* provides the "compelling reason" necessary to overrule our precedent. The dissent first disagrees with our analysis of *McKune* and then seeks to distinguish *Carrillo*.

Focusing on the plurality's "useful instruction" phrase, 536 U.S. at 37, 122 S.Ct. 2017, the dissent suggests that the plurality in *McKune* did not commit to apply *Sandin* in future Fifth Amendment cases and further that the plurality viewed the "atypical and significant hardship" test as a necessary but not sufficient condition for a finding of compulsion. But, as we explained, the plurality treated the *Sandin* test as more than "useful instruction." And neither Justice O'Connor nor federal circuit courts applying *McKune* have read the plurality opinion as being so equivocal about the *Sandin* standard. Justice O'Connor certainly read the plurality's embrace of the *Sandin* standard as more

than an ad hoc determination limited to *McKune*'s facts. *McKune*, 536 U.S. at 54, 122 S.Ct. 2017 (O'Connor, J., concurring) ("Although I do not agree that the standard for compulsion is the same as the due process standard we identified in *Sandin v. Conner*, I join in the judgment reached by the plurality's opinion." (citation omitted)); *see also Searcy v. Simmons*, 299 F.3d 1220, 1225 (10th Cir.2002) (interpreting the plurality reasoning in broad terms by explaining that "Justice O'Connor did not agree with the plurality that a finding of compulsion under the Fifth Amendment should be measured by reference to *Sandin*'s 'atypical and significant hardship' standard").

The dissent also questions our assessment of the "narrowest grounds" discernible from the several rationales in *McKune*. We acknowledge that at least two federal circuit courts of appeal have opined that Justice O'Connor's concurring opinion constituted the holding of the Court in *McKune* under the narrowest grounds doctrine. *See Ainsworth v. Stanley*, 317 F.3d 1, 4 (1st Cir.2002); *Searcy*, 299 F.3d at 1225. The Tenth Circuit in *Searcy* stated that "[b]ecause Justice O'Connor based her conclusion on the narrower ground that the KDOC's policy was not compulsion under the Fifth Amendment, we view her concurrence as the holding of the Court in *McKune*." 299 F.3d at 1225. With due respect to the Tenth Circuit, we have difficulty understanding the broad statement that the challenged policy "was not compulsion under the Fifth Amendment" as a narrower standard than the *Sandin* test. The First Circuit in *Ainsworth* stated that Justice O'Connor concurred in *McKune* on "much narrower grounds," 317 F.3d at 3, but also that her concurrence was "*arguably* more narrow" than the plurality, *id.* at 4 (emphasis added) (quoting *Lurie v. Wittner*, 228 F.3d

113, 130 (2d Cir.2000)). But the First Circuit could not articulate the "narrower ground" found in Justice O'Connor's concurrence and concluded that because *McKune* provided "no clear guideposts," the court "must resort to our own sound judgment, so long as it does not conflict with existing precedent." *Ainsworth*, 317 F.3d at 4. In our view neither of these decisions adequately explains how, given Justice O'Connor's rejection of the *Sandin* test as too narrow, her application of a broader, though unarticulated, test for compulsion can be characterized as providing a narrower rationale.

Indeed, the Supreme Court itself has stated that the narrowest grounds doctrine is a "test more easily stated than applied." *Nichols v. United States*, 511 U.S. 738, 745, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994). It could be that the First and Tenth Circuits viewed Justice O'Connor's approach as limited to the specific facts of *McKune*, rather than adopting a broad test. Therefore her approach would be narrower than the plurality's adoption of the *Sandin* test as the standard for testing compulsion in the prison setting. Even if that is an accurate application of the narrowest grounds doctrine, it would not change our conclusion in this case because, the dissent's misgivings notwithstanding, it is clear to us that a majority composed of the plurality and Justice O'Connor (and likely the dissenting Justices as well) agreed in *McKune* that consequences that impose atypical and significant hardship in prison constitute compulsion for purposes of the Fifth Amendment.

The dissent also relies on the *McKune* plurality's discussion of *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), to conclude that there is insufficient guidance on the question of whether consequences that increase the term of incarceration constitute compul-

sion to justify overruling *Morrow*. The circumstances in *Murphy* involved a probation condition requiring the probationer, Murphy, to be truthful with his probation officer. 465 U.S. at 422, 104 S.Ct. 1136. Describing *Murphy*, the plurality in *McKune* stated that fearing the possibility of additional jail time if he remained silent, Murphy admitted his guilt about a rape and murder to his probation officer. 536 U.S. at 43, 122 S.Ct. 2017. The plurality then stated that "[t]he Court found no Fifth Amendment violation despite the defendant's fear of being returned to prison for 16 months if he remained silent." *Id.* The dissent here cites the *McKune* plurality's favorable citation of *Murphy* for the proposition that the threat of additional jail time did not constitute compulsion and concludes that there is therefore no compelling reason to overrule *Morrow*.

The problem with this reasoning is not the dissent's understandable reliance on the *McKune* plurality's characterization of *Murphy*, but the inaccuracy of the plurality's characterization. In fact, the six-Justice majority in *Murphy* unequivocally rejected both the *McKune* plurality's factual premise that Murphy feared more jail time if he remained silent and the plurality's legal premise that the threat of additional jail time does not constitute compulsion.

The precise question faced by the Court in *Murphy* was whether the Fifth and Fourth Amendments prohibited the introduction into evidence in a criminal trial of Murphy's incriminating admissions made to his probation officer. 465 U.S. at 422, 104 S.Ct. 1136. The Court initially explained the general rule, subject to several exceptions, that a witness facing questions that could elicit incriminating answers must assert the privilege against self-incrimination; otherwise, his answers will be considered voluntary and not violative of the privilege against self-incrimination.

*Id.* at 429, 104 S.Ct. 1136. One of the exceptions to that general rule is where assertion of the privilege is penalized so severely that free choice is foreclosed and answers given without assertion of the privilege are considered compelled. *Id.* at 434, 104 S.Ct. 1136.

Addressing this exception, the Court in *Murphy* explained that a penalty could not be found in that case based on fear of incarceration, whether the test was subjective or objective. *Id.* at 437, 104 S.Ct. 1136. In terms of a subjective test, the Court noted that "[t]here is no direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent." *Id.* Addressing an objective standard, the Court stated that any subjective fear that Murphy's probation could be revoked for asserting his privilege against self-incrimination would have been objectively unreasonable, because the Court's "decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Id.* at 438, 104 S.Ct. 1136. Indeed, the Court pointed out that the state conceded that "it would not, and legally could not, revoke probation for refusing to answer questions calling for [incriminating] information." *Id.* Emphasizing the point, the Court reiterated that "in light of our decisions proscribing threats of penalties for the exercise of Fifth Amendment rights, Murphy could not reasonably have feared that the assertion of the privilege would have led to revocation." *Id.* at 439, 104 S.Ct. 1136. Accordingly, the Court concluded that Murphy was not compelled to answer based on a reasonably perceived threat of revocation, and the penalty exception did not apply. *Id.*

In summary, the Court in *Murphy* decided that there was no Fifth Amendment violation in that case, not because the threat of additional incarceration is not compulsion, but because there was no such threat. Moreover, the Court found that there was no such threat because revoking probation for assertion of the privilege would be unconstitutional. Therefore, as the dissent in *McKune* stated, "[t]he plurality [wa]s quite wrong to rely on *Murphy* for the proposition that an individual is not compelled to incriminate himself when faced with the threat of return to prison." *McKune,* 536 U.S. at 61 n. 7, 122 S.Ct. 2017 (Stevens, J., dissenting).

The dissent here may be correct that the *McKune* plurality's reliance on its mistaken view of *Murphy* suggests that the plurality would not consider a threat of additional incarceration to constitute compulsion, although that position seems inconsistent with the plurality's earlier reference to the fact that the program challenged in *McKune* did not extend incarceration or affect eligibility for good-time credits or parole. But our conclusion does not rest on the plurality's view of a threat of incarceration, which is ambiguous, but on its adoption of the *Sandin* atypical and significant hardship test, which is not ambiguous. Moreover, *Murphy* is, if anything, supportive of our conclusion when the reasoning of the *Murphy* opinion, rather than the *McKune* plurality's mischaracterization of it, is considered.

Moving on from *McKune,* the dissent is also of the view that our reliance on *Carrillo* is misplaced. Essentially, the dissent's position is that *Carrillo* was a procedural due process case that says nothing about compulsion under the Fifth Amendment. But that simply takes us back to *McKune.* The issue in the Fifth Amendment context is whether threatened consequences in the prison setting are sufficiently serious to be considered

compulsion. The plurality in *McKune* reasoned that even though the origin of the *Sandin* test was due process analysis, it provides an appropriate benchmark to measure compulsion in the prison setting. 536 U.S. at 37, 122 S.Ct. 2017. And as explained above, in our view, with Justice O'Connor's concurrence, at least a majority of the Supreme Court agreed in *McKune* that consequences that satisfy the *Sandin* test constitute compulsion in the prison setting. Accordingly, we find the dissent's attempt to distinguish *Carrillo* as only relevant to due process concerns unpersuasive.

Finally, the dissent cites several federal court cases holding that extension of incarceration by denial of good time or parole for failure to participate in sex offender treatment is not compulsion. *See Ainsworth*, 317 F.3d at 6; *Searcy*, 299 F.3d at 1223–27; *Asherman v. Meachum*, 957 F.2d 978, 980–83 (2d Cir.1992). The circuit courts in *Ainsworth* and *Searcy* pointed out that there was no liberty interest in either parole or good time credits, respectively, because both were awarded at the discretion of the state. *Ainsworth*, 317 F.3d at 5; *Searcy*, 299 F.3d at 1226. Because the "liberty" of which the inmates would be deprived was discretionary and the adverse consequences that followed refusal to participate in treatment were not automatic, the courts concluded that the inmates were not penalized, but chose not to avail themselves of an opportunity for a discretionary benefit. *See Ainsworth*, 317 F.3d at 5; *Searcy*, 299 F.3d at 1226. The discretionary reward systems at issue in *Ainsworth* and *Searcy* were significantly different than the mandatory Minnesota system on which we based our conclusion in *Carrillo* that there is a liberty interest in an inmate's supervised release date, deprivation of which constitutes atypical and significant hardship.[2] *Ainsworth* and *Searcy* are not inconsistent with our determination that after *McKune*, where imposition of additional incarceration time infringes on a liberty interest, it constitutes compulsion. Rather, they illustrate only that where no liberty interest is involved, the deprivation may not rise to the level of compulsion.[3]

Other courts, addressing non-discretionary systems, have concluded that extended incarceration constitutes compulsion for self-incrimination purposes. *E.g., Donhauser v. Goord*, 314 F.Supp.2d 119, 129 n. 8 (N.D.N.Y.2004) ("[A]pplying the vast sea of compulsion principles applied by the various opinions in *McKune* and the federal appellate decisions that followed, [we find that] the loss of good time credits imposed automatically and directly for plaintiff's failure to give up his right to silence and participate in the [sex offender treatment] program, violate every single one of them.").

---

**2.** The Commissioner has advised us of a recent decision of the Eighth Circuit Court of Appeals upholding the North Dakota sex offender treatment program against a Fifth Amendment compulsion challenge. *Entzi v. Redmann*, 485 F.3d 998 (8th Cir.2007). Under the North Dakota system, like the systems at issue in *Ainsworth* and *Searcy*, the department of corrections had discretion whether or not to award sentence-reduction credit. *Entzi*, 485 F.3d at 1004.

**3.** The dissent acknowledges that the third case it cites in this respect, *Asherman v. Meachum*, was decided before *McKune*, but notes that it has not been overruled. Although the Second Circuit has not addressed the continuing viability of *Asherman*, we observe that in *Donhauser v. Goord*, 314 F.Supp.2d 119, 125, 138 (N.D.N.Y.2004), the federal district court for the Northern District of New York did not consider *Asherman* to preclude its ruling that automatic loss of good time credits constituted compulsion under the Fifth Amendment.

In light of our *Carrillo* precedent coupled with that of the Supreme Court, in the context of Minnesota's sentencing scheme, extension of the inmates' incarceration time for their refusal to admit sexual offenses in sex offender treatment did rise to the level of compulsion for purposes of their Fifth Amendment privilege against self-incrimination. Nevertheless, even though the compulsion element is met, to prevail the inmates must also satisfy the incrimination prong of the test for a Fifth Amendment violation. We turn now to that issue.

### III.

Compulsion does not violate the Fifth Amendment privilege against self-incrimination unless the information the claimant would be compelled to divulge is incriminating. Answers that would in themselves support a conviction or that would furnish a link in the chain of evidence needed to prosecute the claimant are incriminating for purposes of the privilege. *State v. Brown,* 500 N.W.2d 784, 787 (Minn.1993) (citing *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)). "[I]t need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman,* 341 U.S. at 486–87, 71 S.Ct. 814. But the risk of incrimination faced by the claimant must be substantial and real, not trifling or imaginary. *See United States v. Apfelbaum,* 445 U.S. 115, 128, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980). The Supreme Court has explained that a party claiming the privilege against self-incrimination must establish a

"reasonable ground to apprehend danger * * * from his being compelled to answer * * *. *[T]he danger to be ap-*

*prehended must be real and appreciable,* with reference to the ordinary operation of law in the ordinary course of things,—not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct."

*Hiibel v. Sixth Judicial Dist. Court of Nev.,* 542 U.S. 177, 190, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (emphasis added) (second omission in original) (quoting *Brown v. Walker,* 161 U.S. 591, 599–600, 16 S.Ct. 644, 40 L.Ed. 819 (1896)).

The first issue regarding the incrimination prong that is presented by these cases is whether the privilege survives after conviction for the crime about which the questions might be incriminating. Although neither this court nor the Supreme Court has directly addressed this issue, there is no real dispute that the privilege can be invoked while a direct appeal of a conviction is pending, as was the case in *Johnson.* The Supreme Court has explained that "[i]t is true, as a general rule, that where there can be no further incrimination, there is no basis for the assertion of the privilege. We conclude that principle applies to cases in which the sentence has been fixed *and the judgment of conviction has become final.*" *Mitchell v. United States,* 526 U.S. 314, 326, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (emphasis added). The logical converse of that statement is that the privilege may be asserted *until* the judgment of conviction has become final. Federal circuit courts have so held. *See, e.g., United States v. Kennedy,* 372 F.3d 686, 691 (4th Cir.2004) ("We have held in no uncertain terms that a defendant's right to invoke the Fifth Amendment as to events for which he has been convicted extends to the period during which the conviction is pending ap-

peal."). The court of appeals has held, and the Commissioner does not dispute, that "[t]he privilege against compelled self-incrimination 'continues until the time for appeal has expired or until the conviction has been affirmed on appeal.'" *State v. Kaquatosh,* 600 N.W.2d 153, 157 (Minn. App.1999) (quoting *United States v. Duchi,* 944 F.2d 391, 394 (8th Cir.1991)); *see also* 1 *McCormick on Evidence* § 121 (John W. Strong et al. eds., 4th ed.1992).

■ We agree, and now hold that a convicted individual can claim the privilege against self-incrimination as long as a direct appeal of that conviction is pending, or as long as the time for direct appeal of that conviction has not expired. Because extension of incarceration constitutes compulsion, and because a direct appeal of Johnson's conviction was pending when he refused to admit the crime of which he was convicted, we affirm the court of appeals' holding that the Commissioner's extension of Johnson's incarceration by 45 days for his refusal to admit his crime in sex offender treatment violated his privilege against self-incrimination.

■ This holding does not, however, resolve Henderson's case, because Henderson's direct appeal was exhausted at the time he refused to participate in sex offender treatment. The court of appeals in *Henderson* held that an inmate whose direct appeal is exhausted can no longer invoke his Fifth Amendment privilege. *Henderson,* 715 N.W.2d at 133. The court concluded that the possibility of a collateral attack is not enough to extend the privilege unless the inmate is able to show that such proceedings are necessary to correct a manifest injustice. *Id.* at 132.

Henderson argues that the court of appeals too narrowly defined the duration of an inmate's privilege against self-incrimination. Henderson asserts that because his conviction could have been overturned in his federal habeas proceeding, any admissions he might have made could have been used against him in a new trial. At oral argument, Henderson's attorney acknowledged that because Henderson testified at trial and denied committing the crime, any later admission that he did commit the crime could be used as the basis of a perjury charge. Henderson argues that both possibilities render any admission he might have made in sex offender treatment incriminating.

The Commissioner also disagrees with the court of appeals' rationale. She argues that the "manifest injustice" standard is unmanageable and that the privilege ends when the direct appeal is resolved, or when the appeal period has expired.

The Commissioner urges us to hold that the privilege against self-incrimination can no longer be invoked once the direct appeal has been exhausted. We decline to do so in this case.

■ In order to determine whether the privilege against self-incrimination was available to Henderson, we must determine whether an admission by him could have been incriminating. Because Henderson testified at trial that he had no sexual contact with the victim, an admission to the contrary in the SOTP would have been incriminating, as it might have supported a conviction for perjury.[4] It is

---

4. This aspect of the self-incrimination issue was not raised by Henderson until oral argument before this court. Although issues not raised below will generally not be considered on appeal, this is not an ironclad rule. *Oanes v. Allstate Ins. Co.,* 617 N.W.2d 401, 403 (Minn.2000). Where, as here, the facts on which the issue turns are not disputed, neither party is prejudiced by the absence of a ruling by the trial court and the remaining legal issue may be reached in the interests of justice. *See id.*

well-established in federal courts that the privilege against self-incrimination can properly be invoked based on fear of a perjury prosecution arising out of conflict between statements sought to be compelled and prior sworn testimony. *See, e.g., United States v. Lumpkin,* 192 F.3d 280, 285–86 (2d Cir.1999); *United States v. Fortin,* 685 F.2d 1297, 1298 (11th Cir. 1982). There is no reason the same principle would not be applicable here.

Under Minn.Stat. § 609.48, subd. 1 (2006), "[w]hoever makes a false material statement not believing it to be true * * * [i]n or for an action, hearing or proceeding of any kind in which the statement is required or authorized by law to be made under oath or affirmation" is guilty of per-jury. If the false statement was made in a trial for a felony, the sentence for perjury can be up to 7 years. Minn.Stat. § 609.48, subd. 4 (2006). The statute of limitations for perjury is 3 years. Minn.Stat. § 628.26(k) (2006). Because Henderson asserted under oath on January 25, 2002, that he did not have sexual contact with the victim, the state would have been free to use any admission he might have made in the context of sex offender treatment as the basis of a perjury charge until January 25, 2005. Henderson was disciplined for refusing to admit his crime on December 11, 2003.

We agree that if Henderson were to admit his crime of conviction as part of the sex offender treatment program, such an admission would conflict with his previous sworn testimony at trial and could subject him to conviction for perjury. We therefore conclude that the admissions required of Henderson in the context of the sex offender treatment program would present a real and appreciable risk of incrimination.[5] We need only hold that at least in these circumstances of potential prosecution for perjury, the Fifth Amendment privilege against self-incrimination survives exhaustion of the direct appeal of the inmate's conviction.

Henderson also argues that the privilege against self-incrimination survived exhaustion of his direct appeal because at the time he refused to admit his crime of conviction, he was preparing a federal habeas corpus petition which could conceivably have led to reversal of his conviction and a new trial.[6] Because the possibility of a perjury charge renders Henderson's potential admissions in sex offender treatment incriminating, we need not reach the issue of whether the possibility of Henderson's conviction being overturned in a yet-to-be commenced collateral attack presents the requisite real and appreciable risk of incrimination.

We reverse the court of appeals' decision that at the time Henderson refused to participate in sex offender treatment, he no longer had a Fifth Amendment privilege against self-incrimination. Because

---

**5.** Despite the general rule that the danger of incrimination must be "real and appreciable," and not simply "imaginary and unsubstantial," many federal circuits have held that the inquiry into whether a statement is incriminating should not consider the actual likelihood of prosecution. *See Carter v. United States,* 684 A.2d 331, 336 (D.C.1996) (citing cases from the Second, Fourth, Fifth, Seventh, and Tenth Circuits that follow this rule). Rather, "once incriminating potential is found to exist, courts should not engage in raw speculation as to whether the govern-

ment will actually prosecute." *United States v. Sharp,* 920 F.2d 1167, 1171 (4th Cir.1990).

**6.** To be clear, at the time that Henderson refused to admit his crime in sex offender treatment, he simply had the intention of filing a federal habeas corpus petition. Therefore, the question of whether an offender who presently has a collateral attack on his conviction pending can invoke the privilege is not before this court.

extension of incarceration constitutes compulsion and because there was a real and appreciable risk that any admissions made by Henderson would be incriminating in a potential perjury prosecution, we hold that the Commissioner violated Henderson's privilege against self-incrimination by extending his incarceration by 45 days for refusal to admit his crime in sex offender treatment.

Affirmed as to *Johnson;* reversed as to *Henderson.*

ANDERSON, G. Barry, J. (dissenting).

I respectfully dissent. We held in *State ex rel. Morrow v. LaFleur,* 590 N.W.2d 787, 789 (Minn.1999), that extending an inmate's supervised release date due to his failure to participate in a sex offender treatment program is not "compulsion" in violation of the Fifth Amendment. "We are extremely reluctant to overrule our precedent" and require a "compelling reason" to do so. *State v. Lee,* 706 N.W.2d 491, 494 (Minn.2005) (internal quotations omitted). The majority nevertheless argues that *McKune v. Lile,* 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002), and *Carrillo v. Fabian,* 701 N.W.2d 763 (Minn. 2005), require us to overrule *Morrow.* I disagree with the majority's reading of *McKune* and the application of *Carrillo.* Because we are reluctant to overrule precedent and no compelling reason to do so has been advanced, I would apply *Morrow.*

In this case, inmates Johnson and Henderson each claim that their Fifth Amendment privilege against self-incrimination was violated by the extension of periods of incarceration for refusal to admit crimes in a sex offender treatment program. In *Morrow,* we held that giving an inmate a choice between treatment and confinement for a larger portion of his sentence was not compulsion within the meaning of the Fifth Amendment.

590 N.W.2d at 792–93. We noted that "[c]ompulsion is the touchstone of the Fifth Amendment," and concluded that Morrow's choice between treatment and confinement for a larger portion of his sentence did not "rise to the level of compulsion necessary in order to constitute a Fifth Amendment violation." *Id.* at 792 (internal quotations omitted). We also said that "[a] prisoner's supervised release date is conditional on compliance with prison rules, *including* participation in 'treatment or other rehabilitative programs.'" *Id.* at 793 (quoting Minn.Stat. § 244.05, subd. 1b(b) (1998)). Absent a compelling reason to overrule *Morrow,* Johnson's and Henderson's claims must fail.

In *McKune v. Lile,* the Supreme Court concluded that imposing less attractive prison conditions on an inmate as a result of the inmate's refusal to admit past crimes as part of Kansas's sex offender treatment program did not rise to the level of compelled self-incrimination. 536 U.S. at 29, 122 S.Ct. 2017. Because the inmate refused to participate in the program, he was transferred to a maximum-security unit and lost certain privileges, including visitation rights, work opportunities, and access to a personal television. *Id.* at 30–31, 122 S.Ct. 2017.

*McKune* did not have a majority opinion. A four Justice plurality, borrowing the "atypical and significant hardship" test from *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), found no compulsion. *McKune,* 536 U.S. at 37, 41, 122 S.Ct. 2017. The plurality recognized that the *Sandin* test was not a "precise parallel" but provided "useful instruction" and a "reasonable means" of assessing compulsion. *Id.* In its strongest endorsement of the *Sandin* standard, the plurality stated that it "provides a reasonable means of assessing whether the re-

sponse of prison administrators to correctional and rehabilitative necessities are so out of the ordinary that one could sensibly say they rise to the level of unconstitutional compulsion." *Id.* at 41, 122 S.Ct. 2017. Unlike the majority here, I do not read this somewhat equivocal statement as a requirement that future courts apply *Sandin* in Fifth Amendment cases.

The *McKune* plurality also did not say that *any* threatened consequences amounting to "atypical and significant hardships" violate the Fifth Amendment. The plurality's language suggests that an atypical and significant hardship is a necessary, but not a sufficient, condition for compulsion: a prison rehabilitation program "does not violate the privilege against self-incrimination if the adverse consequences an inmate faces * * * do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life." 536 U.S. at 37–38, 122 S.Ct. 2017. It does not necessarily follow, as the majority concludes, that the threat of an atypical and significant hardship is *ipso facto* compulsion. The majority's conclusion is certainly reasonable, but before overruling our own precedent based on a fractured Supreme Court decision with no clear holding, I would require an unequivocal statement from that decision of the standard we are to apply. I do not find such a standard in the *McKune* plurality.

Justice O'Connor concurred in the result, but rejected the plurality's application of the "atypical and significant hardship" standard. *Id.* at 48–49, 122 S.Ct. 2017 (O'Connor, J., concurring). While she indicated that she favored a "broader" test, Justice O'Connor did not articulate what test she had in mind; rather, she described the particular consequences at issue in *McKune* and opined that they were not severe enough to be "compulsive on

any reasonable test." *Id.* at 48–49, 53–54, 122 S.Ct. 2017.

When no single reasoning explains the result of a divided Supreme Court, we apply the "narrowest grounds doctrine" of *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Because Justice O'Connor's concurrence was confined to the facts of *McKune,* her conclusion that the program before the Court did not create compulsion is the holding of *McKune. See, e.g., Ainsworth v. Stanley,* 317 F.3d 1, 4 (1st Cir.2002) (describing Justice O'Connor as concurring on much narrower grounds); *Searcy v. Simmons,* 299 F.3d 1220, 1225 (10th Cir.2002) ("[W]e view [Justice O'Connor's] concurrence as the holding of the Court in *McKune.*"). The majority argues that the plurality and Justice O'Connor agree that the Fifth Amendment test for compulsion is at least as broad as the *Sandin* test, so the teaching of *McKune* is that any consequence that meets the *Sandin* test is one that creates compulsion for Fifth Amendment purposes. Assuming that this is an accurate reading of the plurality, it places more weight on Justice O'Connor's passing statement that she favors a "broader" test than it will bear. Justice O'Connor might favor a test qualitatively different than *Sandin*'s, that would find no compulsion where some "atypical and significant" consequences are threatened. Without any insight into Justice O'Connor's thinking beyond the facts of *McKune,* I do not believe we are justified in finding an implied consensus among her concurrence and the plurality. Instead, as *McKune* offers "no clear guideposts" for compulsion claims, we should "resort to our own sound judgment, so long as it does not conflict with existing precedent." *Ainsworth,* 317 F.3d at 4.

Whatever lessons can be drawn from *McKune,* they do not involve additional

incarceration time, the issue confronting us here. Although both the plurality and Justice O'Connor hinted in *McKune* that additional incarceration time *might* rise to the level of compulsion for Fifth Amendment purposes, 536 U.S. at 38, 52, 122 S.Ct. 2017, these comments were dicta and the plurality was generally equivocal about how it might view an extended term of incarceration. The plurality, furthermore, cited with approval *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). *McKune,* 536 U.S. at 42–43, 122 S.Ct. 2017. The plurality read *Murphy* to find no Fifth Amendment violation where an inmate's probation agreement required him to be truthful with his probation officer or face execution of his suspended 16–month prison sentence.[7] 536 U.S. at 43, 122 S.Ct. 2017. While *Murphy* involved the threat of additional prison time, the plurality mentioned it as a choice that did not amount to compulsion. 536 U.S. at 43, 122 S.Ct. 2017. In light of all this, I do not believe we have a compelling reason to extend the *Sandin* test into the realm of extension of supervised release dates and overrule *Morrow.*

Accepting for the sake of argument the majority's divination of *McKune,* the majority still needs to go through *Carrillo v. Fabian* to reach its conclusion that *Morrow* is no longer good law. In *Carrillo,* the issue was whether the Commissioner provided Carrillo with sufficient procedural due process prior to delaying his supervised release date for the purposes of a disciplinary offense. 701 N.W.2d at 766. In analyzing Carrillo's procedural due process complaint, our initial inquiry was "whether Carrillo has a liberty interest in his supervised release date." *Id.* at 768.

Applying *Sandin,* we held that "any extension of an inmate's period of imprisonment represents a significant departure from the basic conditions of the inmate's sentence" and concluded that Carrillo had "a protected liberty interest in his supervised release date that triggers a right to procedural due process before that date can be extended." 701 N.W.2d at 771, 773.

*Carrillo* did not involve a Fifth Amendment self-incrimination claim. Moreover, *Carrillo* did not explicitly overrule (or even mention) *Morrow.* While inmates undoubtedly enjoy a right to procedural due process before a supervised release date is extended, it does not follow that they enjoy greater Fifth Amendment self-incrimination protection if the release date is extended. *Carrillo* does not mean that prison authorities cannot extend a supervised release date; it only means that they cannot do so without affording a hearing to the inmate.

*Carrillo*'s due process analysis, moreover, does not help us determine whether an inmate has been compelled to testify against himself. *Carrillo* focused on Minnesota's statutory penal scheme, which created a presumption that an inmate would be released from prison on a certain date, and concluded that an extension of incarceration represented "a significant departure from the basic conditions of the inmate's sentence" requiring due process protection. 701 N.W.2d at 772–73. But the basic conditions of the inmate's sentence should make no difference to a compulsion analysis. Where an inmate is asked to choose between self-incrimination and additional prison time, it seems to me that the level of compulsion is the same wheth-

---

7. As the majority correctly notes, the *McKune* plurality's recital of the facts in *Murphy* is not entirely accurate. The point remains, nevertheless, that the plurality was operating under the assumption from its reading of *Murphy* that the threat of additional prison time did not amount to compulsion.

er the prison time was a presumptive part of his sentence or not.

Numerous federal circuit courts have considered this issue and held that extension of a supervised release date for failure to participate in treatment is not compulsion. *See Ainsworth,* 317 F.3d at 2; *Searcy,* 299 F.3d at 1227; *Asherman v. Meachum,* 957 F.2d 978, 980 (2d Cir.1992).[8] While the majority cites cases that have held differently, I find that the Supreme Court has not spoken clearly on this issue, nor is there a national consensus that would compel us to overturn *Morrow.* I would hold that extending an inmate's supervised release date because of his failure to participate in a sex offender treatment program does not rise to the level of compulsion necessary to violate the inmate's Fifth Amendment privilege against self-incrimination.

GILDEA, J. (dissenting).

I join in the dissent of Justice G. Barry Anderson.

---

8. Although *Asherman* arose before *McKune,* it has never been overruled.